PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LISA CHAMPION,
             *Plaintiff-Appellant,*

v.

BLACK & DECKER (U.S.)
INCORPORATED; THE BLACK &
DECKER DISABILITY PLAN,                  No. 07-1991
             *Defendants-Appellees,*

             and

THE BLACK & DECKER LIFE
INSURANCE PLAN,
             *Defendant.*

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Cameron McGowan Currie, District Judge.
(0:06-cv-01548)

Argued: September 23, 2008

Decided: December 19, 2008

Before NIEMEYER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and T. S. ELLIS, III,
Senior United States District Judge for the Eastern District
of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Senior Judge Hamilton and Senior Judge
Ellis joined.

**COUNSEL**

**ARGUED**: Nekki Shutt, CALLISON, TIGHE & ROBIN-SON, L.L.C., Columbia, South Carolina, for Appellant. David L. Woodard, POYNER & SPRUILL, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Susanna K. Gibbons, POYNER & SPRUILL, Raleigh, North Carolina, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, we review an ERISA plan's discretionary determination denying disability benefits to an employee where the plan's administrator is alleged to have operated under a conflict of interest. Before the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), we would have either applied a modified abuse-of-discretion standard of review to neutralize any effect of the conflict of interest, *see, e.g.*, *Stanford v. Cont'l Cas. Co.*, 514 F.3d 354, 357 (4th Cir. 2008), or we would have concluded that no conflict existed at all, *see Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 179-80 (4th Cir. 2005). But now, under *Glenn*, we must take a new approach.

Applying *Glenn*, we conclude that in this case a conflict of interest did indeed exist; that we nonetheless review the plan's determination under the familiar abuse-of-discretion standard; and that we consider the conflict only as a factor, among several, in determining whether the plan's determination was reasonable. Conducting our review in this manner, we find that the plan in this case did not abuse its discretion, and accordingly we affirm.

I

Lisa Champion, a former employee of Black & Decker (U.S.) Inc. ("Black & Decker"), commenced this action under

the Employee Retirement Income Security Act of 1974 ("ERISA") against the Black & Decker Disability Plan ("the Plan") and Black & Decker as the sponsor and administrator of the Plan. She challenges the Plan's termination of her disability benefits after the Plan paid her benefits for a period of 30 months.

When Champion began working for Black & Decker in 1995, she came under the Plan, which Black & Decker both funds and administers. As authorized by the Plan, Black & Decker employed CIGNA Integrated Care as its claims administrator, but Black & Decker retained ultimate authority to make determinations of whether to pay disability benefits. The Plan grants to the "Plan Manager," a Black & Decker executive, specific powers and duties, including the responsibility "to decide all questions concerning the Plan and the eligibility of any person to participate in the Plan or to receive benefits." It requires that the Plan Manager base his determinations on "suitable medical evidence and a review of the Participant's prior employment history that the Plan Manager deems satisfactory in its sole and absolute discretion."

In the proceedings before the district court, the parties stipulated (1) that the Plan gives discretion to the Plan Manager to make determinations, such as whether Champion is to receive the disability benefits claimed in this case, and (2) that judicial review of any determination is to be conducted under the abuse-of-discretion standard. The parties reserved, however, the right to argue whether the standard must be adjusted for a conflict of interest.

Substantively, the Plan provides for the payment of disability benefits, using two different definitions of disability, depending on how long the employee has been ill or injured. One definition applies to benefits payable up to 30 months, and another applies to benefits payable after 30 months. During the first 30 months, an employee is considered disabled and eligible for benefits if the illness or injury results in the

employee's "complete inability . . . to engage in his *regular occupation with the Employer*." (Emphasis added). After 30 months, the employee is considered disabled and eligible for benefits only if the employee is completely unable "to engage in *any gainful occupation or employment with any employer* for which the Employee is . . . reasonably qualified by education, experience or training." (Emphasis added). Additionally, after 30 months, the Plan terminates disability benefits if the disability was "initially attributable to a Mental Health . . . Disability" or later "substantiated on a Mental Health . . . Disability Diagnosis."

In 1999, Champion was diagnosed with a "complex partial seizure disorder," based in part on "epileptiform activity in the left temporal region." Her actual epileptic seizures were mostly of the *petite mal* or "absence" variety and were thereafter controlled with medication. Treating physicians noticed that Champion also reported seizure-like events that were not epileptic seizures. These events were sometimes characterized as panic attacks and sometimes as "pseudoseizures." Pseudoseizures are a recognized medical diagnosis with symptoms closely resembling epilepsy, causing physicians often to misdiagnose one as the other. Champion was also diagnosed with various emotional and psychiatric conditions including anxiety, depression, panic attacks, and post-traumatic stress disorder.

In January 2002, Champion had a seizure at work that required emergency room care. Thereafter, she never returned to work at Black & Decker. She did, however, apply for short-term disability benefits under the Plan. CIGNA Integrated Care assessed Champion's condition and denied her application. Champion appealed to the Plan's Appeals Committee, composed entirely of Black & Decker employees, and the Committee reversed CIGNA's denial and awarded benefits, which continued for 30 months.

After 30 months, CIGNA terminated benefits, concluding that Champion's disability resulted from mental illness and

therefore, under the Plan, no benefits were payable after 30 months. On Champion's appeal to the Plan's Appeals Committee, the Committee affirmed CIGNA's decision. Champion then retained counsel, who requested a second appeal. The Appeals Committee granted counsel's request and considered additional evidence submitted by Champion, but again denied further benefits.

Champion commenced this action under § 502 of ERISA, 29 U.S.C. § 1132, seeking disability benefits beyond the first 30 months. The district court initially found that the Plan had abused its discretion by failing to determine whether Champion's disabilities actually fell within the Plan's explicit definition of "Mental Health Disability." The Plan defined a mental health (or substance abuse) disability as one "with a primary diagnosis in the range of 290 to 319 under the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM) promulgated by the World Health Organization." But, because the district court was also unable to find evidence sufficient to grant Champion benefits outright, it ordered a remand to the Plan (1) to determine the proper ICD-9-CM classification of Champion's disability, and (2) to give Champion the opportunity to submit additional evidence.

On remand, the Plan's two consulting physicians reviewed the record, including the records provided by Champion's treating physicians, and concluded that Champion's pseudoseizures were properly classified as 300.11 under the ICD-9-CM, thus falling within the Plan's 290 to 319 range for a mental health disability. The physicians also concluded that when they considered only Champion's non-mental-health conditions, she would be able to work because her physical seizures were infrequent and manageable with medication. Champion also submitted additional evidence, including a physician's opinion that she was indeed totally disabled by her *epilepsy and pseudoseizures*. With this evidence before it, the Plan determined that Champion's pseudoseizures had a mental health diagnosis and therefore her disability was sub-

stantiated on a mental health disability. It reaffirmed its termination of Champion's benefits after the initial 30-month period.

The district court again reviewed the Plan's determination in light of the augmented record and concluded that the Plan had not abused its discretion in denying further benefits. Champion appealed and now contends that (1) the Plan operated under a conflict of interest and therefore judicial review should be modified to give the Plan less deference; (2) in any event, the Plan's determination was unreasonable; and (3) the district court abused its discretion in ordering a remand to the Plan to allow for augmentation of the record.

II

After the district court decided this case and Champion appealed, the Supreme Court decided *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), which clarified when a conflict of interest exists and how a conflict is to be taken into account. *Glenn* altered several aspects of judicial review of ERISA plan determinations in the Fourth Circuit.

In *Glenn*, the Court began by restating the foundational principles of judicial review of ERISA plan determinations. *First*, it pointed out, a reviewing court must be guided by principles of trust law, taking a plan administrator's determination as "a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." 128 S. Ct. at 2347. *Second*, courts must "review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Id.* at 2348 (internal quotation marks and citation omitted). *Third*, when the plan grants the administrator "discretionary authority to determine eligibility for benefits, . . . a deferential standard of review is appropriate." *Id.* (emphasis and citations omitted). And *fourth*, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be

weighed as a factor in determining whether there is an abuse of discretion." *Id.* (internal quotation marks, citations, and emphasis omitted).

Focusing particularly on the fourth principle, the *Glenn* Court held that when the plan administrator serves in the dual role of evaluating claims for benefits and paying the claims, the dual role itself creates a conflict of interest. 128 S. Ct. at 2346, 2348. The Court found in the case before it that because an insurance company served as both administrator and insurer of the plan—as administrator it had discretionary authority to determine claims and as insurer it paid the claims —the insurance company had a conflict of interest. *Id.* at 2346. But it also noted that the same conflict is created when *an employer* serves in a similarly dual role. *Id.* at 2348.

The Court held, however, that the presence of a conflict of interest did not change the standard of review from the deferential review, normally applied in the review of discretionary decisions, to a *de novo* review, or some other hybrid standard. 128 S. Ct. at 2350. Indeed the Court stated that the conflict of interest should not otherwise lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* at 2351. Rather, it held that when reviewing an ERISA plan administrator's discretionary determination, a court must review the determination for abuse of discretion and, in doing so, take the conflict of interest into account only as "one factor among many" that is relevant in deciding whether the administrator abused its discretion. *Id.* The process that the Court envisioned is similar to that followed by courts generally in applying any multiple-factor test to review for reasonableness. As the Court said:

> In such instances, any one factor will act as a tie-breaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific

importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.

*Id.*

The principles announced in *Glenn* alter some of our court's earlier approaches to reviewing discretionary determinations made by ERISA administrators allegedly operating under a conflict of interest. For example, before *Glenn*, when we found a conflict of interest, we applied a "modified" abuse-of-discretion standard that reduced deference to the administrator to the degree necessary to neutralize any untoward influence resulting from the conflict of interest. *See, e.g.*, *Stanford*, 514 F.3d at 357. And before *Glenn* we defined a conflict of interest more narrowly. *See Colucci*, 431 F.3d at 179-80.

As it now stands after *Glenn*, a conflict of interest is readily determinable by the dual role of an administrator or other fiduciary, and courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by that administrator, even if the administrator operated under a conflict of interest. Under that familiar standard, a discretionary determination will be upheld if reasonable. *See Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long-Term Disability Plan*, 509 F.3d 644, 650 (4th Cir. 2007). And any conflict of interest is considered as one factor, among many, in determining the reasonableness of the discretionary determination. In *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), we identified eight nonexclusive factors that a court may consider, including a conflict of interest:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43 (footnote omitted).

Accordingly, we review the Plan's determination in this case for abuse of discretion, taking into account any conflict of interest as one of the factors considered in determining reasonableness.

### III

Turning to Champion's appeal, she devotes the first half of her brief to arguing that a conflict of interest exists in this case because Black & Decker "had a significant financial interest in the decision to terminate disability benefits to Champion." She argues accordingly that under our pre-*Glenn* decisions, judicial review of the Plan's determination should be under a "modified abuse of discretion standard." *See, e.g.*, *Stanford*, 514 F.3d at 357. She contends that the conflict of interest was substantial and was manifested by the Plan's several procedural deficiencies in determining her claim.

In view of *Glenn*, decided after the district court had ruled and this appeal had been taken, we conclude that the Plan did indeed operate under a conflict of interest. The Plan sponsor, Black & Decker, served in the dual role of both evaluating

and paying Champion's claims. This dual role alone fulfills the requirements for finding a conflict under *Glenn*. *See* 128 S. Ct. at 2346, 2348. But the consequence of this finding is not to modify the standard of review, as urged by Champion, but rather to consider the conflict as but one among many factors in determining the reasonableness of the Plan's discretionary determination. We do this by considering the relevant factors, as identified in *Booth*. *See* 201 F.3d at 342-43.

IV

Acting under the discretion conferred by the Plan's terms, the Plan terminated payment of disability benefits to Champion after 30 months, concluding in its final affirmation of the decision (1) that "her physical condition — her seizure disorder — did not render her unable to engage in a gainful occupation," as her physical seizures were "infrequent" and often followed her failure to comply with her medication regimen; (2) that she also suffers from a range of mental health conditions, including pseudoseizures, for which the proper ICD-9-CM code was 300.11, "which is within the range of the definition of Mental Health in the Plan"; and (3) that while Champion's pseudoseizures and depression "may have rendered her unable to engage in a gainful occupation after the initial 30 month period of Disability," she was not entitled to benefits under the Plan after the 30-month period because such benefits for a disability "substantiated by a Mental Health condition," were limited to 30 months. Thus, the validity of the Plan's determination to deny Champion further benefits turns on whether the 300.11 classification was proper.

The district court concluded that there was substantial evidence to justify the Plan's characterization of Champion's pseudoseizures as a mental health disability, i.e., a condition falling within the ICD-9-CM code range of 290 to 319, and that Champion could not demonstrate that she was unable to engage in "any gainful occupation" absent consideration of her pseudoseizures and other mental health problems. While

the court considered the opinions of various doctors that were submitted to the Plan, it found Dr. Ebeling's opinion most enlightening on the matter. As the court stated:

> Dr. Ebeling provided a full and persuasive explanation of his reasons for characterizing Champion's pseudoseizures as psychiatric in origin. Most critically, he referred to Dr. Gettlefinger's contemporaneous characterization of the cause of the pseudoseizures as being related to other mental health causes (anxiety and depression). He also: noted Champion's own statements which suggest her pseudoseizures were of psychological origin; supported his opinion as to the nature of the pseudoseizures with a specific reference to a medical text; and explained how his characterization of the pseudoseizures fit with Champion's significant psychiatric difficulties.

In light of Dr. Ebeling's opinion and the other evidence in the record, the court concluded that "it was not unreasonable for the Plan to conclude that Champion's pseudoseizures should be characterized as psychiatric in origin . . . . Given this conclusion, it follows that the Plan acted within its discretion in determining that Champion's pseudoseizures came within the Plan's definition of a mental health condition," thus making it reasonable for the Plan to find that "Champion was not disabled by any non-mental health condition."

On Champion's appeal, we review the district court's decision *de novo*, employing the same standards governing district court review of a plan administrator's discretionary decision. *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008).

There is no dispute that if Champion's pseudoseizures fall within the ICD-9-CM code range of 290 to 319, they are treated as a mental health disability that affects whether Plan

benefits continue after 30 months. But the parties vigorously dispute whether her pseudoseizures fall within the 290 to 319 range. And the record on this issue is ambiguous.

During the extensive diagnostic monitoring of Champion performed at the Medical College of Georgia, physicians observed seizures both psychogenic and physical in origin. The professionals treating her over the years used a wide range of ICD-9-CM diagnostic codes. Some fell between 290 and 319, and some did not, while many of the professionals did not assign ICD-9-CM codes at all. Champion's primary neurologist wrote in 2004, "she continues to have spells, the dilemma is which of them are epilepsy and which of them are *pseudoseizures related to anxiety and depression*." (Emphasis added).

The Plan's consulting physician Dr. Ebeling analyzed Champion's medical record, which included the notes of her treating physicians, and he found that code 780.39, which Champion contends should have applied to her pseudoseizures, was inappropriate as an actual diagnosis. He explained that the 780 to 799 code range refers to "symptoms, signs and ill-defined conditions," and the ICD-9-CM diagnosis guide submitted by Champion confirms that this is, indeed, the heading for the *entire* 780 to 799 range. Dr. Ebeling found her treating physicians' notations and her overall medical history most consistent with a 300.11 diagnosis for her pseudoseizures.

Champion did produce extensive evidence that her seizures and pseudoseizures were attributable to physical causes, including past physical abuse. But that evidence did not advance her argument that the pseudoseizures themselves should not fall within the code range of 290 to 319. The Plan's definition of mental health disability unambiguously states that the 290 to 319 range governs "*regardless of underlying cause* for such disorder, whether such underlying cause

is mental health, substance abuse, organic, *physical* or medical in origin." (Emphasis added).

In view of this record, it was reasonable for the Plan to have concluded that her pseudoseizures fell within the Plan's mental health diagnosis definition. But this still leaves the question of whether the Plan properly terminated benefits after 30 months on the ground that Champion's inability to work was "substantiated on" a mental health disability diagnosis.

Champion produced no evidence showing or tending to show that she could substantiate her disability claim on just her epilepsy. She produced persuasive evidence that she is disabled by her *pseudoseizures and epilepsy*. But because the Plan reasonably concluded that her pseudoseizures fell within the definition of mental health disability, her evidence does not support a claim that her epilepsy alone rendered her unable to work within the Plan's definition of disability.

In contrast, the Plan provided substantial reasons to believe that Champion would not be disabled without her mental health disabilities. Dr. Ebeling concluded from the record that Champion's physical seizures were "relatively infrequent, not intractable, and would not preclude her from any occupation which does not require her to operate machinery or work at unprotected heights." In accepting this conclusion, the Plan acted reasonably, especially when Champion's own correspondence with the Plan supports the conclusion.

Taking into consideration the first seven *Booth* factors, to the extent they are relevant, we find no evidence to support Champion's claim that the Plan abused its discretion. The Plan applied the language defining benefits, as well as the limitations on those benefits; it considered the materials supplied by the professionals who treated Champion; it fully cured any initial procedural irregularities; and it engaged in a

decisionmaking process that was ultimately reasoned and principled.

This brings us to the eighth and final *Booth* factor — whether the Plan's determination is rendered unreasonable by the effects of its conflict of interest. Although the district court did not address the effect of any alleged conflict of interest, it did find that the Plan did not act in a biased manner. It noted that even though the Plan initially made procedural errors requiring a remand, "[t]he errors [did] not . . . appear to have been based on any improper intent." The court found it significant that

> Plaintiff's initial claim was denied by a [third party administrator] which lacked a direct financial interest in the matter, and that the initial denial was reversed by the Plan based on only minimal submissions by Plaintiff. It is also significant that the Plan allowed Plaintiff an additional untimely appeal, after her appeals were otherwise concluded and upon the appearance of counsel. During the final appeal, the Plan presented the issue to two independent experts whose advice the Plan followed in its ultimate denial decision. While the court has found errors in the process and in Plan interpretation, it finds no evidence of bad faith or improper intent.

When we heed *Glenn*'s instruction on considering the conflict factor, we can find no evidence raising a concern that would increase the weight of the conflict. *See* 128 S. Ct. at 2351. Indeed, when the Plan overruled the initial denial of short-term disability benefits by CIGNA, the third-party administrator, it manifested an approach demonstrating an unbiased interest that favored Champion, making the conflict factor "less important (perhaps to the vanishing point)." *Id.* In the same vein, the Plan also voluntarily granted Champion a second appeal after she hired a lawyer, allowing her to present further matters. This second appeal, which was not required

by the Plan language, increased the likelihood of an accurate final decision, thereby also reducing the conflict factor "to the vanishing point." *Id.* Champion provides no contrary evidence tending to show that the Plan's dual role "affected the benefits decision." *Id.*

Thus, the evidence does not support giving such weight to the conflict that it "act[s] as a tiebreaker when the other factors are closely balanced." *Glenn*, 128 S. Ct. at 2351. Indeed, the factors are not closely balanced here, and the conflict factor in particular approaches "the vanishing point." *Id.* The Plan provided a well-reasoned justification for its decision denying further benefits, based on the record and the Plan language. Utilizing the combination-of-factors method employed by *Booth* and endorsed in *Glenn*, we conclude that the Plan did not abuse its discretion in terminating Champion's disability benefits after 30 months.

V

Champion also contends that the district court erred by ordering a remand to the Plan to determine the appropriate ICD-9-CM code for her pseudoseizures, rather than simply ordering that the Plan continue her benefits after the 30-month period.

We agree that "remand should be used sparingly." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999) (internal quotation marks and citation omitted). But we review a district court's decision whether to remand for abuse of discretion. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). In conducting such a review, we recognize that district courts require flexibility to augment records, as "[s]ome ERISA cases involve complex medical issues crucial to the interpretation and application of plan terms." *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993).

The district court here faced just such an issue in ascertaining the appropriate ICD-9-CM classification code for Champion's pseudoseizures. The court also recognized that if the pseudoseizures were a mental health problem, then the record justifying benefits beyond 30 months was sparse and inadequate. Accordingly, it ordered the remand to permit the Plan to make the proper classification and to permit Champion to supplement the record. We find that in the circumstances of this case, the district court acted within its discretion in remanding to the Plan, and therefore we reject Champion's argument.

The judgment of the district court is

*AFFIRMED*.