**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1431**

EVA SPRY,

                    Plaintiff - Appellee,

          v.

EATON CORPORATION LONG TERM DISABILITY PLAN,

                    Defendant – Appellant,

          and

BROADSPIRE SERVICES INCORPORATED,

                    Defendant.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  Margaret B. Seymour, District
Judge.  (2:07-cv-00156-MBS)

Argued:  March 25, 2009                Decided:  June 2, 2009

Before MOTZ, TRAXLER, and SHEDD, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

**ARGUED:** Anna K. Raske, BENESCH, FRIEDLANDER, COPLAN & ARONOFF,
LLP, Cleveland, Ohio, for Appellant.  Robert Edward Hoskins,
FOSTER LAW FIRM, LLP, Greenville, South Carolina, for Appellee.
**ON BRIEF:** Jeffrey D. Zimon, BENESCH, FRIEDLANDER, COPLAN &
ARONOFF, LLP, Cleveland, Ohio, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Eaton Corporation Long Term Disability Plan ("the Plan") appeals a district court judgment against it in an action brought by Eva Spry alleging that the Plan wrongly terminated her long-term disability benefits. We reverse and remand for entry of judgment in favor of the Plan.

## I.

Eaton Corporation is a multi-national company that offers both short-term and long-term disability benefits for many of its employees. It funds these plans and helps to administer them.

To be eligible to receive long-term disability ("LTD") benefits under the Plan, a participant must show that she "cannot work due to an illness or injury," that she has a "covered disability," and that she is "under the continuous care of a physician who verifies, to the satisfaction of the Claims Administrator, that [she is] totally disabled." J.A. 158. The Claims Administrator is a "third party administrator retained by Eaton to process and review disability claims and to rule on the first level appeals from denials of claims." J.A. 136. Broadspire Services Incorporated ("Broadspire") was the Plan's Claims Administrator. The Plan also allows for a final appeal to Eaton as the Plan Administrator. For ease of reference, we

3

will refer to the Claims Administrator and the Plan Administrator collectively as "the Administrator."

As is relevant here, a claimant is considered to have a "covered disability," if she is "totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which [she is], or may become, reasonably well fitted by reason of education, training or experience." J.A. 158. To determine whether a claimant has a covered disability, the Administrator evaluates objective evidence of the claimed disability, including

- Physical examination findings (functional impairments/capacity);

- Diagnostic tests results/imaging studies;

- Diagnosis;

- X-ray results;

- Observation of anatomical, physiological or psychological abnormalities; and

- Medications and/or treatment plan.

J.A. 162. For a claim that has been approved, the Plan requires continued periodic certification of the disability, which can include independent medical examinations, medical file and record reviews, and functional capacity tests.

Spry is a 62-year-old woman who resides in Manning, South Carolina. She began working for Eaton in 1980 and was a Plan participant. In early 2000, she began complaining of numbness

4

in her hands.  According to her primary care physician, Dr. Joseph Williams, an MRI of her cervical spine revealed the following:

> Markedly severe spinal stenosis focally at C3-4 due to large osteophytes compressing the cervical cord as well as an accompanying disc protrusion that protrudes along with the osteophytes.  Moderate to severe spinal stenosis also evident at C4-5 without disc herniation.  Herniated disc is also present at C6-7 postero-rightward and impinging upon the exiting nerve root on the right and effacing the neural foramen.

J.A. 516.  Spry consequently ceased working on March 20, 2000, and underwent surgery.  Although she felt better afterwards, she was not ready to return to work by July 2000.  Because her six-month waiting period for LTD benefits was coming to an end, she submitted an LTD benefits claim.

In support of her claim, Dr. Joseph Williams and her other primary care physician, Dr. Brenda Williams, signed statements attesting that Spry suffered from cervical myelopathy and cervical spondylosis.  The statements reported that Spry suffered weakness in her arms and shoulders, and hand tremors, and that she had difficulty walking.  They affirmed that Spry was "[t]otally and [p]ermanently [d]isabled" and could not work even with restrictions.  J.A. 588-89.

On August 23, 2000, her LTD benefits claim was approved. In late 2000, Spry also was awarded Social Security disability

5

income benefits, having been determined by the government to be disabled as of March 17, 2000.

After the Administrator approved Spry's LTD benefits claim, her eligibility to continue to receive LTD benefits was reviewed periodically, beginning in 2002. For the first review, Dr. Brenda Williams opined that Spry continued to be totally disabled and noted that Spry was "chronically in pain in the shoulders, arms, hands, [and] knees and is significantly anxious and depressed." J.A. 537. The review resulted in Spry being approved for continued benefits.

The next review occurred in 2004 and also resulted in the continuation of Spry's benefits. That review considered an opinion of Dr. Joseph Williams that Spry continued to be unable to work primarily as a result of her cervical problems. He noted that her diabetes also contributed to her disability. He reported limited motion in her neck and shoulders, decreased strength in her right hand, and pain in her shoulder and neck. He also noted that she suffered from headaches and balancing problems and from a "[m]arked limitation" from a "[m]ental/[n]ervous [i]mpairment." J.A. 543.

The Administrator sent Spry's records to two other physicians. Dr. Tamara Bowman, an internal medicine specialist, concluded, "[f]rom an internal medicine standpoint, there are insufficient objective clinical findings documented to support a

level of functional impairment that would render [Spry] unable to perform any occupation." J.A. 566. However, Dr. Jaime Wancier, a neurologist, found that Spry was totally disabled as of May 5, 2004. He stated:

> The presence of continued complaints of pain in the neck down into the arms, decreased strength in the upper extremities, etc. are most likely related to chronic changes within the spinal cord secondary to the severe stenosis that the claimant had as reported in all of the x-rays. Most likely, the claimant sustained chronic changes within the spinal cord secondary to vascular compression. These changes are most likely chronic in nature, irreversible and most likely, permanent.

J.A. 563.

The next review of Spry's claim began in 2005. Spry submitted a detailed statement documenting her continued problems as well as a statement from Dr. Joseph Williams noting his continued view that she was totally disabled. Dr. Williams also submitted his medical records through June 2005.

As with the prior review, the Administrator asked Dr. Bowman to review Spry's records. Dr. Bowman concluded again that Spry was not totally disabled from an internal medicine standpoint and also noted that in the records she was provided "there is no documentation of a comprehensive neurologic, musculoskeletal, or joint examination." J.A. 656. On that basis, Dr. Bowman stated that she could not "comment on any

7

restrictions or limitations based on [Spry's] history of cervical myelopathy." J.A. 656.

The Administrator then referred Spry to neurologist Dr. Charles Jervey on October 11, 2005, for an independent medical examination (IME). Dr. Jervey examined Spry and concluded that her surgery had corrected her cervical myelopathy. He noted that her postoperative neurosurgeon's exam was "relatively normal . . . except for residual mild weakness which according to [the neurosurgeon's] report was much improved." J.A. 671. Dr. Jervey observed that Spry did not put forth full effort in the strength tests he administered. He stated that although she continued to express "subjective complaints," because his "objective findings [we]re relatively limited and seem[ed] to [be] primarily . . . effort related," he was "unable to determine precisely how much, if any, disability exists." J.A. 671. He continued, "My best opinion, however, is that she does have the strength to return to work. The primary issue would be one of pain and again that is a subjective complaint. . . . I would think the patient could return to light duty work." J.A. 671.

Accepting Dr. Bowman's and Dr. Jervey's opinions, the Administrator had a vocational specialist prepare an Employability Assessment Report ("EAR") based on the functional limitations derived from those opinions. After speaking with

8

Spry concerning her vocational background, interests, and functioning level, the vocational specialist concluded that Spry was employable and identified several sedentary jobs that she could perform. A subsequent Labor Market Survey ("LMS") found that several jobs that she could perform existed in Manning and surrounding areas. Accordingly, Spry's benefits were terminated on January 4, 2006, effective February 1, 2006.

Spry appealed the decision. She hired counsel, who submitted results from a cervical myelogram and a CT scan conducted on November 1, 2005, as well as physicians' reports from spinal surgeon Dr. Rakesh P. Chokshi--to whom Dr. Joseph Williams had referred Spry--and radiologist Scott H. Allen. Dr. Chokshi's October 24, 2005, report notes that Spry complained of significant pain but demonstrated motor strength of "5/5 in all the major muscle groups in the upper extremities," with "normal and symmetrical" deep tendon reflexes, and "lumbar range of motion [that] was reasonably well preserved." J.A. 860. Reviewing Spry's November 1 tests, Dr. Chokshi noted that they did "not show any significant stenosis." J.A. 861. He also opined that Spry did not need any further surgery and advised her to stay active, including by doing her neck and back exercises. Dr. Allen, reviewing the same tests, concluded that Spry had a "mild degree of canal stenosis through the area of fusion [that] appears to be due to diffuse bulge of the disc

9

along with spondylosis." J.A. 864. His report added, "There is facet arthritis as well. There is no evidence of disc herniation and there does not appear to be significant foraminal narrowing." J.A. 864.

Spry also submitted updated medical records from Dr. Joseph Williams, including the report from a January 11, 2006, neurological exam. Dr. Williams noted that Spry still had "a residual right cervical radiculopathy" and "some myelopathy" and that she had been advised to undergo more surgery. J.A. 471. Dr. Williams reported that his exam revealed strength of only "3 out of 5 on the right side" and unsteadiness on her feet and left leg. J.A. 471. He stated that Spry suffered from the following ailments: "[c]ervical disc disease S/P cervical disc surgery with residual weakness in right arm," "[h]erniated lumbar disc or left lumbar radiculopathy," diabetes mellitus with "diabetic neuropathy," hypertension, hyperlipidemia, history of "depression and chronic pain syndrome," and history of "gouty arthritis involving left great toe." J.A. 471.

The Administrator asked neurologist Dr. Vaughn Cohan to review Spry's records. Dr. Vaughn concluded that the records did not indicate that Spry was totally disabled and explained why he disagreed with Dr. Wancier and Dr. Joseph Williams. The Administrator subsequently upheld its decision to terminate Spry's benefits, notifying her by a letter dated July 13, 2006.

10

Spry then initiated a final appeal, prompting the Administrator to seek additional physicians to review Spry's records. Osteopath Dr. Michael Goldman concluded that the records contained no evidence that Spry was unable to work. Psychologist Dr. Lawrence Burnstein found no documentation that Spry was totally disabled from a psychological perspective. Internist Dr. Dennis Mazal determined that no internal medical issues would prevent Spry from working. And neurologist Dr. Henry Spira found that no neurological condition precluded employment for Spry. On September 20, 2006, the Administrator also requested neurological and orthopedic opinions from Medical Review Institute of America, Inc. ("MRIoA"). Both MRIoA reviewers concluded that there was no documentation indicating that Spry could not work. By a letter dated November 3, 2006, the Administrator notified Spry that her final appeal had been denied.

Spry subsequently brought suit in federal district court under 29 U.S.C.A. § 1132(a)(1)(B) (West 2009) of the Employee Retirement Income Security Act of 1974 ("ERISA"), claiming that her LTD benefits had been improperly terminated.[1]

---

[1] Although Broadspire and the Plan were both originally named as defendants, Broadspire was later dismissed from the action.

11

Deciding the case based on the administrative record, the parties' legal memoranda, and counsels' oral arguments, the district court granted judgment to Spry. The court found that because the Plan grants the Administrator discretion to interpret and apply the Plan provisions, the termination decision would be reviewed for abuse of discretion. At the time of the district court's decision, proof of facts warranting imputation of improper motives to a plan administrator required application of a modified-abuse-of-discretion standard, thereby reducing the deference given to the benefits decision. See Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 179-80 (4th Cir. 2005); Johannssen v. District No. 1-Pac. Coast Dist., MEBA Pension Plan, 292 F.3d 159, 176 (4th Cir. 2002). Although Eaton funds, sponsors, and administers the Plan, Spry conceded that there was no basis for reducing the deference afforded to the Plan's decision. The district court therefore concluded that it would defer to the Administrator's decision so long as it was reasonable and supported by substantial evidence. The district court found, however, that the decision did not meet that standard, for reasons that we will discuss. The court therefore issued a judgment requiring the Plan to pay Spry LTD benefits.

II.

Since the district court issued its decision, the Supreme Court decided <u>Metropolitan Life Insurance Co. v. Glenn</u>, 128 S. Ct. 2343 (2008), altering the effect of a conflict of interest on the applicable standard of review regarding an ERISA benefits denial. Under <u>Glenn</u>, proof of facts warranting imputation of improper motives to a plan administrator still aids claimants challenging adverse benefits decisions; however, the form of that aid has changed. Such evidence no longer reduces the deference the district court must give the benefits decision. <u>See</u> <u>Champion v. Black & Decker (U.S.) Inc.</u>, 550 F.3d 353, 358 (4th Cir. 2008). Rather, a simple abuse-of-discretion standard is applied and the conflict of interest is taken into account as a factor affecting whether the administrator abused its discretion.[2] <u>See</u> <u>id.</u> Such a conflict is "'more important

---

[2] We have identified eight nonexclusive factors that a court may consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the

(Continued)

13

(perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision.'" Id. (quoting Glenn, 128 S. Ct. at 2351).

The Plan maintains that the district court erred in failing to uphold the termination of Spry's benefits. We review the district court's decision de novo, utilizing the same standard applicable to the district court's review. See id. at 359; Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008). We conclude that the decision to terminate Spry's benefits was within the Administrator's discretion.[3]

Clearly, the evidence before the Administrator was conflicting on the question of whether objective evidence demonstrated that Spry was unable to work. Resolving this conflict was the Administrator's responsibility, and there was nothing inherently unreasonable in the decision not to adopt the opinions of Spry's primary care physicians. See Black & Decker

---

    fiduciary's motives and any conflict of interest it
    may have.

Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

[3] On appeal to us, Spry, for the first time, raises a number of arguments that the Administrator manipulated the decision process in an attempt to terminate Spry's benefits. However, in light of Spry's concession in the district court that there was no basis for reducing the deference afforded to the Plan's decision, Spry has waived those arguments.

14

Disability Plan v. Nord, 538 U.S. 822, 831-34 (2003) (holding that ERISA does not require plan administrators to give special deference to treating physicians' opinions). However, the district court provided several reasons for concluding that the termination of Spry's benefits was unreasonable, and we will address those seriatim, along with some arguments that Spry advances.

The district court first concluded that there was no substantial evidence of any improvement or change in Spry's condition after May 5, 2004—the date Spry was last determined by the Administrator to be unable to work—and that there was substantial evidence that Spry had been unable to work prior to that date. Indeed, the district court also determined that since there was no evidence that Spry's condition had changed, the Plan had no basis for not continuing to rely on Dr. Wancier's opinion. We conclude that the district court's premise that no new evidence showed significant improvement in Spry's condition was incorrect. Such evidence included (1) Dr. Chokshi's report concerning his October 2005 examination in which he observed motor strength of 5/5, reasonably well preserved lumbar strength, and no need for further surgical intervention; (2) Dr. Jervey's October 2005 IME concluding that Spry was capable of light duty work; and (3) the November 1, 2005 cervical myelogram and CT scan showing only a mild degree

15

of stenosis, no disc herniation, no cord deformity, and no foraminal narrowing. The determination that Spry was no longer eligible for benefits was also supported by the medical file reviews of Drs. Cohan, Goldman, Spira, Mazal, and Burnstein.

The district court also concluded that the Administrator's decision to terminate Spry's benefits "did not give adequate consideration to the fact that [Spry] had been approved for Social Security benefits" in November 2000. J.A. 1053. There is no basis for that conclusion, however. The Plan's letter denying Spry's appeal specifically noted that the Administrator had considered the Social Security decision. The government's determination that Spry was disabled in November 2000 certainly did not require the Administrator to decide, based on updated information and additional medical opinions, that Spry remained unable to work more than five years later.

The district court finally concluded that the Plan "relied upon equivocal opinions in denying benefits." J.A. 1053. The district court first noted that Dr. Bowman, an internal medical specialist, opined only that Spry was not disabled based upon her internal medical conditions but did not give an opinion on Spry's neurologic condition. This criticism misses the mark, however, as there is no indication that the Administrator relied on Dr. Bowman's opinion for any neurological proposition. The district court next concluded that Dr. Jervey's opinion was

16

equivocal because he stated that he was "'unable to determine precisely how much, if any disability exists.'" J.A. 1053. But, while Dr. Jervey's opinion was equivocal regarding precisely to what degree Spry is disabled, it was not equivocal on the proposition for which the Plan relied on the opinion, namely, that Spry "could return to light duty work." J.A. 671. Whether Spry could perform an even more difficult level of work was immaterial.[4]

---

[4] The district court also added that "the MRIoA peer review speculated that Dr. Jervey's examination suggested 'pseudoweakness,' despite Dr. Jervey's tentative opinion, four years of recognized disability by Eaton, six years of disability recognized by the Social Security Administration, and unchanged medical findings during the entire period." J.A. 1053-54. As we have explained, Dr. Jervey's opinion was not tentative on the question of whether Spry could perform light duty work, and the record contained substantial evidence that Spry's condition had improved since the benefits determinations referred to by the district court. Moreover, Dr. Jervey's report clearly did suggest that Spry's "weakness" was effort-related. He stated,

> Postoperatively . . . her [neurosurgeon's] exam indicates a relatively normal exam except for residual mild weakness which according to his report was much improved (it was only a 4-4+ weakness to begin with). This indicates to me that at that point in time her weakness was not to the point where it should have impaired her ability to return to her work. On my exam today, her validity score is relatively low. She continues to have subjective complaints and the objective findings are relatively limited and seem to primarily be effort related.

J.A. 671.

17

The district court also concluded that Dr. Cohan's opinion was equivocal because he "indicated that 'a current comprehensive description of [Spry's] neurologic and orthopaedic examination signs would be helpful in further consideration of [Spry's] claim.'" J.A. 1053. Although we cannot find this statement by Dr. Cohan in the record, we believe that the district court intended to reference Dr. Cohan's statement in his June 2006 report that "[a]dditional clinical documentation which would be helpful in further consideration of this claim would be a current comprehensive description of the claimant's neurologic and orthopedic examination signs, as there has been no such report since the Fall of 2005." J.A. 872. This statement did not render equivocal Dr. Cohan's opinion that Spry was not totally disabled. He specifically stated, "In summary, it is my opinion, upon review of the extensive medical documentation submitted that it is not indicative of a functional impairment for 'any occupation' effective February 1, 2006." J.A. 872. He did not suggest that he could not draw that conclusion from the records he reviewed. He stated only that more recent reports would be helpful in the event of "further consideration" of Spry's claim.

In addition to the points raised by the district court, Spry also identifies what she contends are other deficiencies in the Administrator's decision to terminate her benefits. Spry

18

maintains that the Administrator acted unreasonably in not placing more emphasis on Dr. Wancier's 2004 opinion. As we have already explained, however, significant new evidence concerning Spry's condition emerged after Dr. Wancier submitted his opinion. The Administrator reasonably chose to rely on the opinions of doctors who had reviewed this new information.

Spry also contends that each of the medical opinions the Administrator relied on in deciding to terminate her LTD benefits are flawed because they did not assess all of Spry's conditions. See McKoy v. International Paper Co., 488 F.3d 221, 224 (4th Cir. 2007). But the Administrator was not limited to considering the opinions of physicians who addressed all of Spry's conditions. The critical point is that the Administrator considered all of the conditions. And, nothing in the record suggests that the Administrator relied on any physician's opinion for a proposition broader than the opinion that the physician rendered.

Spry also argues that the Administrator acted unreasonably in not considering whether Spry's various medical conditions were cumulatively disabling. However, except diabetes, which Dr. Joseph Williams added as a secondary disabling condition beginning in 2004, no other condition was ever listed by Spry's primary care physicians as being disabling. And, Dr. Mazal opined in his September 2006 review that there was no evidence

19

that Spry's diabetes would prevent her from performing the duties of any occupation.

## III.

In sum, we conclude that the Administrator acted within its discretion in terminating Spry's LTD benefits. We therefore reverse the judgment in Spry's favor and remand to the district court for entry of judgment in favor of the Plan.

<u>REVERSED AND REMANDED</u>