**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1730**

JESSE SOLOMON,

Plaintiff – Appellee,

v.

BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; NFL
PLAYER SUPPLEMENTAL DISABILITY PLAN,

Defendants – Appellants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.  (1:14-cv-03570-MJG)

Argued:  May 9, 2017                          Decided:  June 23, 2017

Before MOTZ, SHEDD, and DUNCAN, Circuit Judges

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Motz
and Judge Shedd joined.

**ARGUED**: Michael Lee Junk, GROOM LAW GROUP, CHARTERED, Washington,
D.C., for Appellants.  Adam Ben Abelson, ZUCKERMAN SPAEDER LLP, Baltimore,
Maryland, for Appellee.  **ON BRIEF**: Cyril V. Smith, ZUCKERMAN SPAEDER LLP,
Baltimore, Maryland, for Appellee.

DUNCAN, Circuit Judge:

This appeal raises the issue of whether the plan administrator for Defendants-Appellants, the Bert Bell/Pete Rozelle NFL Retirement Plan and the NFL Player Supplemental Disability Plan (collectively, the "Plan"), abused its discretion in denying a certain type of disability benefits to Plaintiff-Appellee Jesse Solomon. After the plan administrator determined that Solomon's disability-onset date rendered him ineligible for the benefits he sought, Solomon brought suit under § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The district court concluded that Solomon was entitled to the benefits he claimed and ordered the Plan to provide them. Because the Board failed to follow a reasoned process or explain the basis of its determination--neither addressing nor even acknowledging new and uncontradicted evidence supporting Solomon's application, including that of the Plan's own expert--we are compelled to affirm.

I.

A.

Solomon played professional football in the National Football League ("NFL") for nine seasons before his retirement in 1995. During his football career, he sustained more than 69,000 full-speed contact hits. As a result, he experienced symptoms associated with chronic traumatic encephalopathy ("CTE"), a degenerative brain condition caused by repeated head trauma. He also suffered numerous knee injuries requiring multiple operations. Solomon now suffers from chronic knee pain, chronic headaches, depression,

and anxiety that doctors expect to worsen over time. These injuries forced Solomon to resign from his post-NFL career as a high school teacher and football coach in 2007. Because he was unable to work, Solomon sought benefits under the Plan. Before discussing his application for benefits, we first explain the mechanics of the Plan.

B.

The Plan provides disability benefits to retired players who become totally and permanently disabled ("TPD") as a result of their football career. When a player seeks benefits under the Plan, a two-person Disability Initial Claims Committee ("the Committee") determines whether the player is entitled to benefits. A player can appeal the Committee's decision to the six-member Retirement Board ("the Board"), which is composed of three representatives appointed by the NFL Management Council and three representatives appointed by the NFL Players Association. If either the Committee or the Board finds that the player is substantially prevented from or substantially unable to work, he will be considered TPD. Alternatively, if the Social Security Administration ("SSA") has determined that a player is eligible for social security disability benefits, he is deemed TPD for the purpose of Plan benefits.

For players who are TPD, the amount of benefits to which they are entitled depends upon the date by which their disability rendered them TPD. The Committee and the Board make this determination based on "the facts and circumstances in the administrative record." J.A. 129. Two benefit levels are relevant here: (1) "Football Degenerative," which applies when the disability "results in total and permanent

3

disability before fifteen years after" the player retires;[1] and (2) "Inactive," which applies when the disability results in TPD more than 15 years after retirement. J.A. 125. The benefits paid to players classified as Football Degenerative are more generous than those to players classified as Inactive. At the time Solomon sought benefits, Football Degenerative paid a minimum monthly benefit of $4,000 per month, whereas Inactive paid a flat rate of $3,334 per month. Any benefits paid under the Plan are charged against the salary cap available for active NFL players' salaries.

The Plan also permits a player to submit successive applications if he is denied benefits. However, the Plan restricts such "serial applications" through a conclusive presumption that a player is not TPD for the 12-month period following an initial application. J.A. 127–28. The presumption does not apply if the SSA makes a determination that the player is entitled to benefits.[2]

C.

On March 11, 2009, Solomon first applied for disability benefits under the Plan, asserting that football-related orthopedic injuries rendered him TPD. Although Solomon did not seek benefits for his CTE-related disability in this first application, the medical records he submitted contained evidence of brain injuries. These records included a 2005 MRI showing "white matter changes in the deep white matter of both parietal

---

[1] We use the terms "retire" or "retirement" as shorthand for what the Plan refers to as "the end of the Player's last Credited Season." J.A. 125.

[2] Furthermore, the Committee or the Board "may waive this twelve-month rule upon a showing by the Player that the Player may have become totally and permanently disabled since the date of the original claim due to a new injury or condition." J.A. 128.

4

lobes" of the brain, J.A. 448, and a 2006 letter from Solomon's primary care physician, Dr. Mark Hudson. Dr. Hudson linked the white-matter changes to chronic concussion syndrome, a condition resulting from Solomon's football career and "likely to worsen with time." J.A. 461. In addition, occupational therapist Brian Matuszak opined that Solomon was TPD and could not return to competitive employment. Mr. Matuszak based his decision primarily on Solomon's orthopedic impairments, but noted Solomon's "poor concentration requiring frequent redirection" and "increased psychological barriers to return to work." J.A. 482.

On May 14, 2009, the Committee denied Solomon's application, finding that he was not TPD. Solomon appealed that decision to the Board, which affirmed the denial on November 19, 2009, stating that it relied on its neutral orthopedist's opinion that Solomon's orthopedic ailments did not render him TPD.

During the time in which he was seeking benefits from the Plan, Solomon also filed an application for disability benefits with the SSA, on July 13, 2009. Solomon's SSA application was still pending at the time of the Board's November 2009 denial.

D.

On December 12, 2010, more than 12 months after his first application, Solomon filed a second application for Plan benefits ("2010 Application"). In contrast to his first application, Solomon's 2010 Application claimed that football-related neurological and cognitive impairments caused him to become TPD. This application contained a number of new medical reports describing the severity of his CTE-related disability. For example, Dr. Jamie Fernandez conducted a neuropsychological examination on

5

June 11, 2010, finding that Solomon suffered depressive symptoms, cognitive dysfunction, and "behavioral disinhibition resulting in [Solomon] leaving his job as a football coach" in 2007. J.A. 866. Dr. Dexter Stallworth conducted an MRI that same day corroborating the 2005 MRI and confirming the presence of "white matter lesions along the right and left frontal and parietal lobes of the brain," and noting that these lesions are "thought to be posttraumatic." J.A. 883. Dr. Fernandez prepared another report, dated August 23, 2010, concluding that Solomon suffered from diffuse axonal injury, white matter changes, and postconcussive syndrome resulting from traumatic brain injury ("TBI"). Finally, Dr. Fernandez opined, in a letter dated April 6, 2011, that Solomon suffered severe postconcussive syndrome, possible CTE, and was disabled as a result of his numerous football-related TBIs, extensive orthopedic injuries, cognitive impairment, and severe depression and anxiety.[3]

Pursuant to Plan provisions authorizing a neutral evaluation, the Plan also referred Solomon to an independent neurologist in January 2011. In February 2011, the Plan's expert, Dr. Adam DiDio, concluded that Solomon was TPD as a result of severe postconcussion/posttraumatic head syndrome and possible CTE, noting that there had been a "progressive worsening of cognition over a period of 5–10 years." J.A. 718. And while Dr. DiDio "agreed" with Dr. Fernandez's assessment that Solomon was exhibiting

---

[3] Dr. Fernandez submitted her 2011 letter after the Committee denied Solomon's second application, but before the Board made a decision on his appeal. From the date stamp on the letter, it appears the Board had this document on file at its meetings on August 4, 2011, and November 16, 2011. *See* J.A. 767–68 (date-stamped: "RBM Aug 04 2011" and "RBM Nov 16 2011").

6

signs of CTE, he was "more comfortable labelling [Solomon's] condition postconcussion/posttraumatic head syndrome." J.A. 722. The Plan's physician report form asked, "Has the impairment persisted or is it expected to persist for at least 12 months from the date of its occurrence?" J.A. 716. For all three of Solomon's impairments--cognitive impairments, anxiety/depression, and headaches--Dr. DiDio checked the box designated "yes." J.A. 716.

On March 9, 2011, the two-person Committee deadlocked on whether Solomon was TPD, resulting in a denial of benefits under the terms of the Plan. Solomon appealed to the Board. With the appeal of his 2010 Application pending before the Board, an SSA Administrative Law Judge ("ALJ") granted Solomon disability benefits on June 21, 2011. The ALJ found that Solomon's disability-onset date was October 29, 2008.[4]

On August 4, 2011, the Board designated Solomon TPD based on the SSA determination. The Board awarded him "Inactive" benefits, stating that "[a]fter review of the records you submitted, the Retirement Board found that the record did not support a finding of total and permanent disability prior to March 31, 2010"--the 15-year cutoff date after Solomon's retirement. J.A. 808. On September 27, 2011, Solomon sought reclassification to the more generous benefit level, "Football Degenerative," contending that he became TPD before the March 2010 cutoff date.

---

[4] The ALJ did not explain why it selected the October 29, 2008 disability-onset date, but the date appears to be based on the date that occupational therapist Brian Matuszak conducted the orthopedic evaluation.

7

On November 23, 2011, the Board denied Solomon's reclassification request, concluding that he was not entitled to Football Degenerative benefits. Specifically, the Board concluded that its denial of Solomon's first application in November 2009 "is incompatible with finding that you were totally and permanently disabled prior to March 31, 2010." J.A. 823. In addition, the Board asserted that (1) the SSA's determination that Solomon was disabled since October 29, 2008 was not binding, and (2) the record did not support a finding that Solomon was TPD prior to March 2010 "because the medical records you submitted with your current appeal were submitted together with your prior claim and appeal, both of which were denied." J.A. 823. The Board did not acknowledge or address the new and uncontradicted evidence that Solomon submitted with his 2010 Application. Nor did the Board reference its own expert's determination that Solomon's brain injuries rendered him TPD, with impairments that had worsened over a prolonged time period. The Board's denial functioned as a final decision under ERISA.

E.

On November 14, 2014, Solomon timely filed the instant suit to recover Football Degenerative benefits. In the court below, the parties filed cross-motions for summary judgment, agreeing that Solomon was TPD and that his TPD stemmed from his football career. The issue before the district court was whether the Board's decision that Solomon became TPD after the March 2010 cutoff constituted an abuse of discretion. Both parties asked for a final determination of benefits and neither sought remand. The district court concluded that Solomon was entitled to Football Degenerative benefits because (1) the

8

SSA's disability-onset date bound the Board, and (2) alternatively, the Board's Inactive determination constituted an abuse of discretion. The Plan timely appealed.

## II.

### A.

When considering an ERISA benefit determination, "we review the district court's decision de novo, employing the same standards governing district court review of a plan administrator's discretionary decision." *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 360 (4th Cir. 2008). We review the Board's decision for abuse of discretion, upholding any reasonable decision. *Id.* at 359. A decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). In *Booth v. Wal–Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), this court articulated a set of nonexclusive factors we consider in making the reasonableness determination:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–43.

9

On appeal, the Plan argues that the district court erred in holding that the SSA determination bound the Board and also that the district court erred in holding that the Board abused its discretion when it concluded that Solomon was only entitled to Inactive benefits. Because we agree with the district court that the Board abused its discretion by classifying Solomon as Inactive, we do not reach the question of whether the SSA determination binds the Board.[5]

### B.

The Plan contends that the Board did not abuse its discretion because (1) its denial of Solomon's first application in November 2009 meant Solomon was not TPD as of that date, and (2) Solomon presented no "contemporaneous medical evidence" that he was TPD between November 19, 2009, and the fifteen-year cutoff date of March 31, 2010. Solomon counters that the Board abused its discretion because (1) the Board's 2009 denial found only that Solomon was not TPD as a result of *orthopedic impairments*, and thus, the Board was not entitled to rely on the 2009 denial in reviewing his 2010 Application seeking benefits for his *brain injuries*; and (2) Solomon was not required to produce contemporaneous medical evidence that he became TPD as a result of brain injury between November 19, 2009, and March 31, 2010. We agree with Solomon.

The Board's 2009 denial of Solomon's first application could not categorically foreclose the possibility that Solomon was TPD before November 19, 2009, because

---

[5] We note, however, that the Plan has since been amended to provide that the SSA's determination as to the disability onset date is not binding for the purpose of Plan benefits. J.A. 213–14.

10

Solomon's first application concerned only orthopedic ailments. The Board's unfavorable determination as to that application has no bearing whatsoever on when Solomon became TPD due to the wholly separate and distinct cognitive impairments asserted in his 2010 Application. *Cf. Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 157 (4th Cir. 1993). The Board also failed to recognize or discuss the new evidence concerning cognitive impairments that Solomon submitted with his 2010 Application, summarily dismissing the medical evidence by erroneously stating that "the medical records you submitted with your current appeal were submitted together with your prior claim and appeal." J.A. 823. Even if that were true, however, the Plan's serial-application rule does not permit the Board to ignore pertinent medical records it reviewed in a previous application. The provision only delays applications 12 months, and each time the Board considers an application, it must consider "the facts and circumstances in the administrative record," J.A. 129, using "the care, skill, prudence, and diligence" that a prudent person would use, J.A. 140. Failure to look past the November 2009 denial was arbitrary.

We also reject the Plan's post-hoc argument that Solomon had to submit contemporaneous medical evidence predating the March 2010 cutoff date. Section 5.1(c) of the Plan provides that a retired player is entitled to Football Degenerative benefits if his disability "results in [TPD] before fifteen years" from the date of retirement. J.A. 125. Nowhere does the text require the player to submit "contemporaneous medical evidence" that he was TPD prior to the cutoff date. It requires only that the player *become* TPD within the relevant time frame. In fact, we explicitly rejected this

11

contemporaneous-evidence argument when the Plan raised it before this court more than a decade ago. *Jani v. Bell*, 209 F. App'x 305, 316–17 (4th Cir. 2006) (unpublished). Solomon's medical records postdating the March 2010 cutoff date are relevant to the extent they indicate that he became TPD before then.

Stripped of the arbitrary restrictions on evidence it would consider, the Board provided no justification for denying Solomon Football Degenerative benefits, let alone substantial evidence for doing so. The mere absence of contemporaneous evidence is not evidence at all, and the Board has nothing else to support its conclusion. *See Weaver*, 990 F.2d at 157–59. If the Board had examined record evidence outside the arbitrary four-month window, it would have confronted substantial evidence that Solomon's brain injury caused him to become TPD prior to the March 2010 cutoff. Solomon had been unemployed and unable to work since 2007, and the Board's own neutral neurologist noted in February 2011 that Solomon's brain injuries had worsened "over a period of 5–10 years." J.A. 717–18. In addition, multiple expert reports dated within months of the cutoff date described serious neurological impairments traceable to Solomon's decades-old football career that rendered him TPD.

A fiduciary must rely on substantial evidence to sustain its denial of benefits and thus abuses its discretion when it ignores unanimous relevant evidence supporting an award of benefits. The expert opinions concerning Solomon's CTE-injuries established at least a presumption that Solomon was entitled to Football Degenerative benefits, and the Board did not rely on substantial evidence to contradict them. Indeed, it relied on no evidence at all. Neither in briefing nor oral argument did the Plan cite any affirmative

evidence relevant to brain injuries on which the Board relied. We therefore hold that the Board abused its discretion when it arbitrarily denied Solomon Football Degenerative benefits.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*