**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-2064**

DEAN A. VAUGHAN; MICHAEL GRUENDER; JERRY DEAN BAKER;
LADONNA C. BAKER; EVELYN C. BROWN; GREGORY STEPHAN
COPELAND; REBECCA B. CORUM; BOBBY GERALD DAWKINS; JEFFREY
S. GROSHANS; RYAN A. GRAV; KIMBERLY M. HENRY; DIANE B.
HESS; KARIN M. HUDSON; WILLIAM L. LAWSON, III; XUAN THE
LE; BRENDA C. MORRISON; THOMAS A. NEEDHAM; MARC P. RAY;
THOMAS L. ROACH; DEBRA G. ROBINSON,

Plaintiffs - Appellants,

v.

CELANESE AMERICAS CORPORATION; CELANESE ADVANCED
MATERIALS, INCORPORATED; THE CELANESE AMERICAS CORPORATION
SEPARATION PAY PLAN,

Defendants - Appellees.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte.  Frank D. Whitney,
District Judge.  (3:06-cv-00104-FDW)

Argued: January 28, 2009            Decided: July 30, 2009

Before WILKINSON, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.  Judge King wrote a
dissenting opinion.

**ARGUED:** Louis L. Lesesne, Jr., ESSEX & RICHARDS, P.A.,
Charlotte, North Carolina, for Appellants.  Jeanne Louise

Bakker, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, Philadelphia, Pennsylvania, for Appellees. **ON BRIEF:** Beth A. Vanesse, ESSEX & RICHARDS, P.A., Charlotte, North Carolina, for Appellants. John D. Cole, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Charlotte, North Carolina, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1133 (2006), claiming that their employer denied them requisite compensation under a separation plan. The district court granted summary judgment for the Appellees. We affirm.

## I.

Appellants are former employees of Appellee Celanese Advanced Materials, Inc. ("CAMI"), a subsidiary of Appellee Celanese Americas Corporation ("Celanese"). CAMI was comprised of two separate operations: PBI, which employed Appellants, and Vectran. In 2005, Celanese sold both CAMI operations to separate purchasers: PBI to InterTech Group ("InterTech") and Vectran to Kuraray.

Celanese maintained a Separation Pay Plan ("the Plan"). The Plan provided separation pay for Celanese employees upon termination of their employment under specified conditions, which included the sale of a business unit when the successor employer did not offer a "comparable level of compensation." (J.A. 39.) In the instant case, Appellants received the same base salary from their new employer, InterTech. However, their

benefits were reduced because InterTech did not offer a defined pension plan.

The Vectran sale was the first to be negotiated when CAMI sold its operations. In that transaction, Celanese and Kuraray negotiated a "side letter," which gave the Vectran employees a "signing bonus" to compensate for the reduction in their benefits package. The bonus negotiated in the Vectran sale prompted PBI employees to ask for separation pay under the Plan to supplement their reduction in benefits.

Under the Plan there is a Benefits Committee ("the Committee") to address claims. Cheryl Cunningham was a member of the Committee. During the beginning stage of negotiations for the PBI deal, Cunningham suggested that Appellants would be eligible for separation pay under the Plan. Jay Townsend, the senior Celanese official negotiating the PBI sale, disagreed with Cunningham's suggestion. On April 20, 2005, Townsend conducted a conference call with Cunningham, B.J. Smith (a local human resources representative designated as the Administrator of the Plan), and Mathias Kuhr (Celanese's in-house counsel).[1] At the conclusion of the call, the group agreed that Appellants

---

[1] Cunningham was the only member of the Committee on the call that the parties collectively refer to as the April decision.

4

would not be eligible to receive separation pay under the Plan to supplement their reduced benefits.

In June of 2005, Appellants filed claims under the Plan for separation pay benefits. On July 7, 2005, Smith sent Appellants a letter identifying himself as the Plan Administrator and advising them that they could submit additional evidence for consideration, "[i]n the interest of being fair." (J.A. 79.) He assured them that their claims would be "reviewed in accordance with the claims procedures of the Plan." (Id.) Appellants submitted additional information on July 17, 2005.

On September 21, 2005, Smith sent Appellants a denial letter through his attorney, Jeanne Bakkar. The letter stated that the Committee's decision was final; that the Vectran "signing bonus" was not separation pay under the Plan; that this bonus was paid by Kuraray; and that the phrase "comparable level of compensation" only required a comparable level of salary, not comparable salary and benefits.

Appellants wrote back on October 3, 2005, requesting numerous documents and an explanation of Appellees' denial procedures. Bakkar responded on November 9, 2005, addressing the concerns Appellants raised in the previous letter and with specific instructions on how to appeal.

5

Appellants appealed the Plan Administrator's September decision. On December 29, 2005, the appeal was denied in a letter from Bakkar on behalf of the Committee. The letter stated that the Committee relied on its "discretionary authority" to construe the meaning of "compensation" as only including the base salary. (J.A. 144-46.) Further, the letter stated that the Vectran "signing bonus" provided no precedent to support Appellants' claims.

On March 9, 2006, Appellants filed an action in the Western District of North Carolina for denial of separation pay benefits under the Plan. On September 27, 2007, the district court granted summary judgment for Appellees, concluding that the Committee's discretionary decision to deny separation pay was reasonable under Booth v. Wal-Mart Stores, Inc., 201 F.3d 335 (4th Cir. 2000).

II.

We review a district court's decision to grant summary judgment de novo, and we employ the same legal standards applied by the district court. Elliot v. Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999). With respect to the district court's findings, we review factual findings for clear error and legal

6

determinations de novo.  Williams v. Sandman, 187 F.3d 379, 381 (4th Cir. 1999).

Although we review summary judgment orders in the light most favorable to the non-moving party, Evans v. Techs. Applications & Servs. Co., 80 F.3d 954, 958 (4th Cir. 1996), we must also evaluate a denial of benefits under an abuse of discretion standard when, as here, an ERISA benefit plan vests discretionary authority to make benefit eligibility determinations with the plan administrator, Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997).  An administrator's decision "will not be disturbed if it is reasonable," even if we "would have come to a different conclusion independently."  Id. A decision is reasonable when it is the "result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  Brogan v. Holland, 105 F.3d 159, 161 (4th Cir. 1997) (internal citations omitted); see also Booth, 201 F.3d at 342-43 (listing eight factors that guide the reasonableness analysis, discussed infra).

The regulations promulgated under ERISA prescribe, inter alia, that:  1) Decisions must be made in accordance with plan documents, 29 C.F.R. § 2560.503-1(b)(5) (2008); 2) Plan procedures must be applied consistently, id.; and 3) Notice must be given in writing to deny a claim, state the basis for the

7

denial, reference the plan provision relied upon, identify additional information required to perfect the claim, describe the appeal process, and notify the petitioner of the right to bring a civil action, 29 C.F.R. § 2560.503-1(g) (2008).

## III.

### a.

Appellants first argue that Appellees' actions violated the Plan's requirements because the initial decision to deny the claim was not made by the Committee in a meeting attended by quorum, pursuant to the Plan. See Bedrick By and Through v. Travelers Ins. Co., 93 F.3d 149, 153 (4th Cir. 1996) (emphasizing the importance of ERISA's requirement of "full and fair review" of all denied claims by "appropriate named fiduciary."); Ellis, 126 F.3d at 236-37 (acknowledging importance of ERISA's formal claims process, which protects from arbitrary decision making); Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 157 (4th Cir. 1993) (stating that the "procedural guidelines are at the foundation of ERISA.")

ERISA's claim requirements are only triggered when a claimant makes a "claim for benefits." 29 C.F.R. § 2560.503-1(e) (2008). A "claim for benefits" does not occur until there is a "request for a plan benefit or benefits made by a claimant

8

in accordance with a plan's reasonable procedure for filing benefit claims." Id. Additionally, Section 5.6 of the Plan, titled "Claims Procedures," states: "In the event that the Administrator denies, in whole or in part, a written claim for benefits by a Participant or his beneficiary, the Administrator shall furnish notice of the adverse determination to the claimant." (J.A. 51 (emphasis added).) In the instant case, Appellants had not made a "request for a plan benefit" before the PBI deal closed. The April 22, 2005, conference call was neither in response to Appellants' claims nor a denial of a claim for benefits because Appellants did not make a claim until June 2005. Therefore, ERISA procedures did not govern the Committee's decision during the conference call.

Appellants attempt to skirt the fact that the April decision was not a response to their claims by arguing that they were never afforded fair review under ERISA because Celanese had already made its decision in April concerning the substance of their June claims. The gist of Appellants' argument is that the decision on their claims was "in a sense foreordained." (Appellants' Reply Br. 2.) Appellants' contention has little weight because, as the district court correctly recognized,

> [I]t is in no way extraordinary that the benefits committee would have reached a conclusion as to whether severance benefits would be paid prior to the closing of the divestiture transaction, because the

9

> business partners negotiating the deal would have
> needed to anticipate with a reasonable degree of
> certainty all of the transaction costs that would be
> incurred by the sale.

(J.A. 1327.) Business transactions would be significantly burdened if all discussions and decisions relating to eligibility of benefits must follow the Plan's claim review procedures even when, as here, no claim for benefits has been made. Clearly, a plan fiduciary is not required to initiate formal claim review procedures every time internal discussions with management and plan fiduciaries might affect a potential claim for separation pay. And this Court does not impose such a burden here.

b.

Next, Appellants contend that the district court misapplied the Booth factors in concluding that the fiduciary's interpretation of the Plan and denial of benefits was reasonable. In Booth, this Court established a non-exclusive list of factors that a court reviewing a decision denying benefits in an ERISA case can consider to determine whether the denial was "reasonable":

> (1) [T]he language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decision making process was reasoned

10

and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43. Each factor will be addressed in turn.

(1) Language of the Plan

All parties agree that the Plan does not define "compensation." The district court found that although the meaning of the term is ambiguous, this factor weighed in favor of the Appellees. The district court deferred to the Committee's interpretation of "compensation," because it recognized ERISA's policy of judicial deference, acknowledged the Committee's "inherent discretionary authority," and found "no compelling reason" to adopt Appellants' interpretations of "compensation." (J.A. 1319-20.) The Supreme Court stated in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989), that under ERISA, judicial deference is owed to a fiduciary's reasonable discretionary decision. In this case, the district court considered Appellants' interpretation but decided that the fiduciary's interpretation was reasonable and worthy of deference. For the reasons set forth below, we agree.

Appellants argue that "compensation," as used in Section 1.10, means "benefits" and salary. Appellants contend that in the Plan "Annual Base Pay," or salary, is used to calculate the

11

amount of separation pay, but was never set forth as a synonym for "compensation." Further, the Plan does not refer to "Annual Base Pay" in Section 1.10, which sets out eligibility under the section titled: "Eligible Termination of Employment." Appellants argue that if the Plan intended "compensation" to mean just "Annual Base Pay" it would have said so explicitly as it did in other sections.

The Plan language does not support Appellants' definition. Article III of the Plan, which is otherwise titled "Separation Pay and Special Separation Allowances," begins with Section 3.1: "Benefits Eligibility." This is the first indication, of many, that the Plan defines "benefits" as "separation pay" or "special separation allowances." Section 3.3, "Separation Pay," states:

> If the Participant's employment with the company is terminated as a result of an Eligible Termination of Employment, the Participant shall receive separation pay from the Company in an amount that will vary depending upon the number of Service Years the Participant has with the Company. The separation pay shall be calculated on the basis of one (1) week of pay (based on a pro rata share of the Participant's Annual Base Pay) for each continuous Service Year plus one additional week.

(J.A. 44.) The last section in Article III, "Special Separation Allowances," explains that special separation allowances fall into a category with unused vacation days and are also calculated by considering a participant's "Annual Base Pay." Appellants' argument that "compensation" in Section 1.10(c) of

12

the Plan should include salary and "benefits," as Appellants define the word, is unsupported by the rest of the Plan. The separation pay benefit is an amount of money calculated by looking at an employee's immediate past salary. The formula for calculating separation pay does not include a variable for the value of lost future benefits. It was logical for Appellees to interpret "compensation" as salary since "benefits" are almost exclusively calculated by considering a participant's salary; "benefits" as Appellants define them are not discussed in the Plan.

Article IV, "Benefits Payments," employs the same use of "benefits" as Article III: a benefit is either separation pay or a special separation allowance. This Article, however, adds an important caveat: "The total amount of benefits paid to a Participant shall not exceed the equivalent of twice the employee's Annual Base Pay during the year immediately preceding the termination of his service with the Company." (J.A. 46.) This language caps the amount of special separation allowances that can be paid to a participant in addition to their "Annual Base Pay" under the Plan. Thus, Appellants' argument that "compensation" was meant to encapsulate both salary and benefits, without any explicit explanation in the Plan, is

13

unconvincing.  The Plan accounted for every cent paid to a participant and set out definite limits.

Each of the four criteria for separation pay in Section 1.10 describes circumstances where Celanese would expect an employee to require temporary replacement income because of an involuntary loss of employment with Celanese:

> 1.10 "Eligible Termination of Employment" shall mean the involuntary termination of the Employee's employment due to
> (a) a permanent reduction in force or job elimination;
> (b) a plant or department closing;
> (c) a sale of all or part of a business provided the successor employer does not offer continued reemployment at a comparable level of compensation; or
> (d) an inability to perform required duties (unless this inability is due to a Disability).

(J.A. 38-39.)  If we adopt Appellants' suggestion that Section 1.10(c) grants compensation for lost benefits, then employees that qualify under the Plan through Sections 1.10(a), (b), or (d) would receive unequal compensation where there is no indication of any intent to do so.  It would be unreasonable to conclude from the language of the Plan that employees who qualify for separation pay under Section 1.10(c) are entitled to some special payment that those who qualify under other subsections cannot receive.  Therefore, the district court rightly deferred to the Appellees' interpretation of the Plan.

14

(2) Purposes and Goals of the Plan

Appellants argued that the purpose for "compensation" covering salary and benefits was to "encourage employees facing the sale or shutdown of a business not to prematurely terminate their employment, so that a smooth transition could be made to the new purchaser." (Appellants' Br. 29.) However, the district court found that the Committee reasonably believed the purpose of the Plan was to provide an "income replacement" benefit (J.A. 1320) and that providing separation pay based on lost future benefits would create a windfall contrary to the Plan's goals. The district court rationalized that because Celanese could reduce benefits at any time for any reason, Appellants never had an "earned and vested" right to receive future health and pension benefits. (J.A. 1322.)

We agree with the district court that the purpose suggested by Appellees was reasonable. This Court has continuously emphasized that a fiduciary's reasonable interpretation is owed deference. See Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 179 (4th Cir. 2005), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S. Ct. 2343 (2008); Hickey v. Digital Equip. Corp., 43 F.3d 941, 945-46 (4th Cir. 1995); Doe v. Group Hospitalization & Med. Servs., 3 F.3d

80, 86 (4th Cir. 1993), abrogated on other grounds by Glenn; de Nobel v. Vitro Corp., 885 F.2d 1180, 1185-86 (4th Cir. 1989).

(3) Adequacy of the Materials Considered To Make the Decision and the Degree to Which They Support It

Appellants take issue with the district court's finding that the April decision was an adequate basis for denying their claim. However, the district court correctly found that it was reasonable for the Committee to consider the past business decisions made by the company that affected their ultimate determination; this consideration did not violate ERISA. See e.g., Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994) (holding that employer's decisions in creating benefit plan are business decisions that do not give rise to ERISA procedures). Appellants have not demonstrated that this finding was clearly erroneous.

(4) Whether the Fiduciary's Interpretation Was Consistent with Other Provisions in the Plan and with Earlier Interpretations of the Plan.

Whether the administrator's decision was consistent with its earlier Plan interpretations is highly contested. Appellants argue that the bonus payment to Vectran employees was precedent to support their claim. Conversely, Appellees argue

16

that Appellants' claims were the first claims under the Plan and that the Vectran transaction was not applicable precedent.

The district court found that the Vectran employees did not receive any benefit under the Plan. The Vectran employees were given the difference between their old benefits and the benefits offered by their new employer in the form of a "signing bonus" because of their worth to the overall sale. The district court specifically noted that:

> [B]ecause [Vectran's] principal product was still in the stages of research and development, the intellectual capital of the seven Vectran employees was one of the business's most significant assets. Accordingly, it made good business sense for Celanese to make concessions necessary to close the deal and keep the employees happy enough to continue their employment with the buyer. PBI, however, presented a much different scenario: It was a mature business with over $4 million in annual profits, and human capital was not as much of a critical asset of the business.

(J.A. 1326, internal citations omitted.) The district court gave the fiduciary the deference owed its interpretation of the Plan, and distinguished the divestiture negotiations from the plan administration.[2] Appellants have not demonstrated that the court's factual findings were clearly erroneous.

---

[2] See Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 567 F. Supp. 1184, 1201 (N.D. W. Va. 1983), aff'd, 724 F.2d 406 (4th Cir. 1983) ("When acting on behalf of the pension fund, there is no doubt that a fiduciary having such 'dual loyalty' must act solely to benefit participants and beneficiaries. However, it is the Court's opinion here that when a corporate employer

17

(5) Whether the Decision was Reasoned and Principled and

(6) Consistency with Procedural and Substantive Requirements of ERISA

The facts of this case support the district court's finding that Booth factors (5) and (6) weigh in favor of Appellees. When Smith received Appellants' claims, he immediately notified members of the Committee. Smith sent letters to Appellants acknowledging receipt of the claims and inviting them to submit additional information in support of their claims. Appellants did in fact provide supplemental information, which Smith forwarded to the Committee. When the Committee denied the claims, it stated a clear basis, quoted from the Plan, and attached a summary of the Plan. The denial letter also informed the parties of their right to bring a civil action under

---

negotiates the terms of sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of future pension benefits (at least those that are not protected by ERISA's vesting and non-forfeitability provisions), do not implicate fiduciary duties as to the pension fund. Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund. In other words, the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior in negotiations concerning pension benefits not otherwise affected by the requirements of ERISA.")

18

§ 502(a) of ERISA. In response to the request of Appellants, Appellees provided them with a copy of the Plan.[3]

Appellants have not demonstrated that the September decision denied them any procedures required under ERISA. Therefore, the district court reached the correct conclusions concerning Booth factors (5) and (6). See Brogan, 105 F.3d at 165-66 (determining plaintiff was given full and fair review of his claim because he was notified of specific reasons for the benefit denial and of the relevant plan provisions); Ellis, 126 F.3d at 234-36 (finding that plan administrator complied with ERISA's requirements when it issued letter explaining the reasons for the denial, quoted the relevant plan language, and described appeal procedures).

(7) External Standard Relevant to the Exercise of Discretion

Appellants argue that two external standards of statutory construction governed the exercise of Appellees' discretion. They claim that the doctrine of "expressio unius est exclusio

---

[3] Although the initial letter did not tell Appellants how to appeal their claims, in response to Appellants' next letter, counsel for Smith stated: "In the event that you decide to appeal the Committee's denial of your claim for severance benefits, you may do so by submitting comments in writing, documents, records, and other relevant information to the committee. Please direct your appeal to the committee to my attention." (J.A. 119.)

alterius"[4] leads to the conclusion that the drafters of the Plan did not intend that "Annual Base Pay" be understood as "compensation." In support of their argument, Appellants state that the drafters of the Plan were aware of and used the concept of base salary in determining the amount of benefits; thus, the failure to do so in defining "compensation" supports the conclusion that "compensation" was intended to mean something more. Therefore, under the doctrine of expressio unius, the fact that "Annual Base Pay" was expressly defined and used for another purpose in another section of the Plan means that the drafters would have done the same if "Annual Base Pay" was meant to equal "compensation" in the application of eligibility for separation pay. (Appellants' Br. 26.) This argument is just another way of stating Appellants' contention that "Annual Base Pay" could not possibly equal "compensation" because "Annual Base Pay" is not mentioned in Section 1.10(c). As stated above, Appellants' interpretation of "compensation" does not logically follow from the Plan's language, whereas "Annual Base Pay" does complement the use of "compensation" in Section 1.10(c).

Next, Appellants state that this case is governed by the doctrine of "contra proferentem," which requires a court to

---

[4] "A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." Black's Law Dictionary 602 (7th ed. 1999).

20

construe ambiguous contract language against the drafter. They claim that this doctrine has repeatedly been applied in interpreting ERISA plans and has specifically been identified as an "external standard." (Appellants' Br. 27 (citing Carolina Care Plan Inc. v. McKenzie, 467 F.3d 383, 388 (4th Cir. 2006), cert. dismissed, 128 S. Ct. 6 (2007) ("Faced with such ambiguity, a reasonable administrator-insurer would look to an important external standard for interpreting an ambiguous contractual provision—that it be construed against the drafting party.")).)

Generally, this Court limits the application of the doctrine of contra proferentem in ERISA cases to the interpretation of complicated insurance contracts, particularly health insurance contracts. See, e.g., Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 89 (4th Cir. 1993); Bynum v. CIGNA Healthcare of N.C., Inc., 287 F.3d 305, 313-14 (4th Cir. 2002); Carolina Care Plan Inc., 467 F.3d at 389. In our recent decision in Carden v. Aetna Life Ins. Co., ___ F.3d ___, 2009 WL 635419 (4th Cir. March 11, 2009), we explicitly found that the Supreme Court's recent decision in Glenn forecloses the use of contra proferentem to limit the discretion plan language gives to an administrator to interpret disputed or doubtful terms. Carden, at **3. Neither of the external

standards Appellants raise lessens the deference owed to the administrator's interpretation of the Plan. Thus, the district court did not err in its determination that this <u>Booth</u> factor weighed in favor of Appellees.

(8) Fiduciary Motives and/or Conflicts of Interest

In determining the eighth factor, the court considers the "fiduciary's motives and any conflict of interest it may have," in order to determine the reasonableness of the fiduciary's discretionary decision. See <u>Booth</u>, 201 F.3d at 342-44. Appellants state that because the "funding for the plan comes directly from the coffers of a company, rather than through a funded trust . . . [and the] decision to award or deny benefits impacts defendants' own financial interests . . . a conflict exists and must be weighed under <u>Booth</u>." (Appellants' Br. 45.)

An administrator's conflict of interest is only "one factor among many" that a court considers when determining the reasonableness of an administrator's decision. <u>Glenn</u>, 128 S. Ct. at 2351. The district court recognized that there was a conflict of interest, but determined that management did not exercise any undue influence on Cunningham or other members of the Committee. The district court held that "the benefits committee, although conflicted, was not influenced by improper motives or authorities." (J.A. 1328.) Appellants have not shown

22

that the district court's factual determinations were clearly erroneous.

The district court held a three-day hearing to determine the effect of the conflict. Appellants seem to suggest that we should set aside the district court's factual and credibility determinations. However, this Court must give due regard to the opportunity of the trial judge to weigh the credibility of witnesses. Minyard Enters. v. S.E. Chem. & Solvent Co., 184 F.3d 373, 380 (4th Cir. 1999). The district court thoroughly and appropriately considered the conflict of interest under Glenn. Therefore, this Court finds no reason to overturn the district court's assessment of the Booth factors.

IV.

This Court reviews the district court's determination of its standard for reviewing a plan administrator's decision and interpretations of a plan's language de novo. Colucci, 431 F.3d at 176. Judicial review of an administrator's decision concerning an ERISA plan decision is reviewed "under a de novo standard unless the plan provides to the contrary." Glenn, 128 S. Ct. at 2348 (internal quotation marks and citations omitted); Firestone, 489 U.S. at 115. When the plan language, as here, grants the administrator discretionary authority, review is

23

conducted under an abuse of discretion standard. Glenn, 128 S. Ct. at 2348; Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004).

Although the district court concluded that the Committee "was acting under an inherent, albeit minimal, conflict of interest in that the Plan was unfunded and self-insured," it found that "as a matter of law no reduction in the deference given to the discretionary decision of the benefits committee is necessary to 'neutralize any untoward influence resulting from a [conflict of interest].'" (J.A. 1318 (quoting Booth, 201 F.3d at 343 n.2).)

Appellants argue that because the district court acknowledged that there was a conflict of interest it should have adjusted the degree of deference to sliding scale deference. Appellants' argument has little merit in light of the Supreme Court's holding in Glenn.

In Glenn, the Court held that an administrator's conflict of interest did not change the standard of review from deferential to de novo review, or an alternative hybrid review. Glenn, 128 S. Ct. at 2350; Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358 (4th Cir. 2008); Carden, **3. Specifically, the Court in Glenn stated:

> We do not believe that Firestone's statement implies a
> change in the standard of review, say, from

24

> deferential to de novo review. Trust law continues to apply a deferential standard of review to the discretionary decision making of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.

Glenn, 128 S. Ct. at 2350. The Court stated further that a conflict of interest should not lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." Id. at 2351. Instead, as stated above, a conflict is merely one of the "several different, often case-specific, factors" that a court weighs when evaluating whether there is an abuse of discretion. Id. While Appellants' suggestion that the district court should have used a different standard of review in light of the conflict might have been availing pre-Glenn, it has no merit now.

Second, Appellants argue that where a decision is not made according to the Plan, the decision should not be reviewed for an abuse of discretion. See Sharkey v. Ultramar Energy Ltd., Lasmo PLC, 70 F.3d 226, 229 (2d Cir. 1995); Sanford v. Harvard Indus., Inc., 262 F.3d 590, 597 (6th Cir. 2001). Perhaps this argument would have merit if the April decision were being reviewed. The district court rightly found that "Plaintiffs [sic] claim for separation pay was the first formal claim ever

25

made under the Plan, and consequently the first time that the Committee was obligated to act qua fiduciary in making an authoritative eligibility determination under the Plan. Therefore, Celanese's informal business practices are simply not relevant to this matter." (J.A. 1324.) The district court correctly found that the denial of separation pay in September was the decision under ERISA review and that ERISA procedures did not attach to informal business decisions predating the claims. Appellants cannot demonstrate that the September decision was contrary to the Plan.

V.

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED

26

KING, Circuit Judge, dissenting:

Because of the dubious circumstances of Celanese's decision to deny separation pay to Appellants, I would prefer to dispose of this case by directing the district court to enter judgment in Appellants' favor on their ERISA claim, brought under 29 U.S.C. § 1132(a)(1)(B) to recover benefits due. In any event, the case should be remanded in the wake of Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct. 2343 (2008), for the district court to properly weigh Celanese's conflict of interest in the applicable abuse-of-discretion analysis. Thus, with all respect to my fine colleagues on the panel majority, I dissent.

I.

Two decades ago, the Supreme Court held in Firestone Tire & Rubber Co. v. Bruch that, "[c]onsistent with established principles of trust law, . . . a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). More recently, while this appeal was pending, the Court clarified in Glenn that the abuse-of-discretion standard applies even if the plan administrator operated under a conflict of interest, including the common situation where "the entity that

27

administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." 128 S. Ct. at 2346. The court explained that, although the decision of a conflicted administrator is entitled to deference, the administrator's "conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" Id. at 2350 (quoting Firestone, 489 U.S. at 115) (other internal quotation marks omitted).

Writing for the Glenn majority, Justice Breyer observed that "[t]rust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." Glenn, 128 S. Ct. at 2350. He further explained that

> when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. This kind of review is no stranger to the judicial system. Not only trust law, but also administrative law, can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.
>
> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-

28

specific importance. The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 2351 (citations omitted); see also id. at 2352 (Roberts, C.J., concurring in part and concurring in the judgment) ("The majority would accord weight, of varying and indeterminate amount, to the existence of . . . a conflict in every case where it is present.").

In the wake of Glenn, we have recognized that "any conflict of interest is considered as one factor, among many, in determining the reasonableness of the discretionary determination." Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (reiterating the "familiar standard" that "a discretionary determination will be upheld if reasonable"). And, we have acknowledged the continued applicability of our pre-Glenn reasonableness test, comprised of eight nonexclusive factors that a court may consider (including the existence of a conflict):

"(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials

29

considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have."

Champion, 550 F.3d at 359 (quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000)).*

II.

Here, the district court properly recognized that Celanese was accorded discretionary authority to make benefit eligibility determinations and, thus, that the rejection of Appellants' claim for separation pay was to be reviewed for abuse of discretion. And, the court correctly acknowledged the applicability of our eight-factor reasonableness test in conducting such review. As Glenn now makes clear, however, the

---

* Prior to Glenn, as we observed in Champion, we also accounted for conflicts of interest by applying "a 'modified' abuse-of-discretion standard that reduced deference to the administrator to the degree necessary to neutralize any untoward influence resulting from the conflict of interest." Champion, 550 F.3d at 359. Of course, Glenn abrogated our modified abuse-of-discretion standard. See Glenn, 128 S. Ct. at 2351. Accordingly, I agree with the panel majority's rejection of Appellants' pre-Glenn contention that the district court should have applied the modified abuse-of-discretion standard.

court's analysis of the conflict of interest factor was fundamentally flawed.

A.

Significantly, the district court conducted a three-day bench trial in late July 2007 for the sole purpose of taking evidence on the conflict issue. The court specifically focused on the question of "whether or not there was undue influence on the Benefits Committee which would have impacted the legitimacy of the committee's interpretation of the [Separation Pay Plan]." J.A. 1001. The evidence adduced during the bench trial, as well as that submitted by the parties in support of their cross-motions for summary judgment, reflected the following.

- The Plan required participants to first submit written separation pay claims to the Plan's Administrator, and to then appeal any adverse decision to the three-member Benefits Committee. See 29 U.S.C. § 1133(2) (mandating that ERISA plans "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim").

- Celanese officials repeatedly — but only privately — acknowledged in early 2005 that both the Vectran and PBI employees would be entitled to separation pay under the Plan if they were to receive inferior benefits from the purchasers of their respective business units (Kuraray and InterTech). There was particular concern about the larger separation pay obligation to the PBI employees (approximately $876,000) than to the Vectran employees (about $125,000), and the corresponding effect on the value of the InterTech deal.

31

- On April 1, 2005, Celanese executed a "side letter" with Kuraray — under which Celanese would provide separation pay to the Vectran employees, but the payment would appear to be part of a "signing bonus" funded by Kuraray — apparently to conceal from the PBI employees the payment of Plan benefits to their Vectran counterparts.

- In mid-April 2005, Cheryl Cunningham, Celanese's benefits manager, concluded that the InterTech benefits were indeed inferior and, thus, recommended that PBI employees receive separation pay — just as the Vectran employees (secretly) had.

- At the direction of Jay Townsend, the Celanese official negotiating the PBI-InterTech sale, a telephone conference call was conducted on April 22, 2005, with Townsend, in-house counsel Mathias Kuhr, benefits manager Cunningham, and human resources official B.J. Smith participating. Only Cunningham (as just one member of the three-member Benefits Committee) and Smith (the Plan's Administrator) possessed any authority to decide the separation pay issue.

- During the conference call, Smith convinced Cunningham that the PBI employees were not entitled to separation pay under the Plan — not because of the plain terms of the Plan (which Smith had never read), but based on past practices in non-Plan-related divestitures. Soon after the call, Cunningham and the second member of the Benefits Committee informally agreed that the PBI employees were ineligible for Plan benefits; the third Committee member was never consulted about the matter. The PBI-InterTech negotiations then proceeded with the understanding that any claim for Plan benefits made by the PBI employees would definitely be denied.

- Unaware that the decision to deny them Plan benefits had already been made, the Appellant PBI employees submitted written claims for separation pay in June 2005. Celanese thereafter conducted

32

sham administrative proceedings — orchestrated by its lawyers — in order to give the appearance of a full and fair claims review. As just a few examples of Celanese's egregious and dishonest conduct:

- Smith advised Appellants in a July 7, 2005 letter that they were being permitted, "[i]n the interests of being fair," ten days to submit additional evidence in support of their claims, J.A. 79, but the letter had actually been drafted by a Celanese lawyer as a means to "requir[e] the [PBI employees] to submit all of their evidence up front, most likely limiting any evidence in [any subsequent] lawsuit to the information submitted in the claims process," id. at 239;

- Once Appellants submitted their additional evidence, counsel for Celanese explored various post hoc justifications (other than the plain language of the Plan) for the predetermined April 22, 2005 decision to deny Appellants' claims for Plan benefits; and

- Correspondence from a Celanese attorney to Appellants, sent in the fall of 2005 to announce and defend the benefits denial decision, contained misinformation concerning, inter alia, the decision-making process utilized by Celanese, the Appellants' procedural rights, and the nature of the so-called "signing bonus" paid to the Vectran employees.

- Significantly, the April 22, 2005 benefits denial decision not only contravened Plan procedures (requiring the Plan's Administrator to make the initial claim determination and the Benefits Committee to resolve any appeal thereof), but also deprived Appellants of protections afforded by ERISA (mandating a full and fair review).

33

At the conclusion of the bench trial, the district court acknowledged that "without a doubt . . . it was a sloppy and messy process by which the Benefits Committee reached" the benefits denial decision. J.A. 1005. Nevertheless, the court accepted as truthful the testimony of Cunningham — uncontradicted by direct evidence (though called into question by circumstantial evidence) — that the Committee had not been improperly influenced by Townsend or anyone else. As such, the court concluded that "the best we can say for plaintiffs is that this bench trial ends in a draw." Id. at 1005-06. Because "plaintiffs [had] the burden of proof [and] the party with the burden of proof loses when it's a draw," the court further concluded that it was compelled to "find[] as a matter of fact there was no undue influence on the decision of the Benefits Committee that PBI employees were ineligible for separation pay under the plan." Id. at 1006.

Thereafter, in disposing of the parties' cross-motions for summary judgment by written Memorandum and Order of September 27, 2007, the district court engaged in our eight-factor reasonableness test. The court deemed the conflict of interest factor to be "inapplicable," however, based on its determination at the conclusion of the bench trial "that the benefits committee, although conflicted, was not influenced by improper

34

motives or authorities." J.A. 1328. The court did acknowledge that "[t]he lack of formalities by which the benefits committee's decisions were reached, and the indiscrete mixing of fiduciary and non-fiduciary roles, has not made this an easy case to decide." Id. "However," the court concluded, "Celanese has produced wholly benign motives and reasons for its decision, and Plaintiffs have failed to carry their burden of persuasion by showing that these explanations are implausible." Id. Accordingly, the court ruled that "it was not an abuse of discretion to deny Plaintiffs' claims for separation pay under the Plan." Id. at 1329.

B.

Simply put, the district court's handling of the conflict of interest factor — disregarding Celanese's acknowledged conflict on the ground that Appellants failed to demonstrate by a preponderance of the evidence that there was undue influence on the Benefits Committee — is wholly at odds with controlling Supreme Court precedent, culminating in Glenn. As Justice Breyer observed therein, trust law "requir[es] the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." Glenn, 128 S. Ct. at 2350 (emphasis added). The reviewing judge is not permitted to disregard a conflict for lack of proof by a preponderance of the evidence that such

35

conflict impacted the benefits decision; rather, the judge must simply consider the conflict as one of the factors to be weighed in assessing the decision's overall reasonableness. See Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009) (recognizing that, under Glenn, "a conflict of interest becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion" (quoting Glenn, 128 S. Ct. at 2351). Indeed, the purpose of having a judge — rather than a jury — assess the reasonableness of a benefits decision is that the judge is better-equipped to engage in a nuanced weighing of relevant factors. See Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1007 (4th Cir. 1985) (observing that, under trust law, "proceedings to determine rights under employee benefit plans are equitable in character and thus a matter for a judge, not a jury").

Finally, that the district court wrote off Celanese's conflict of interest as "inapplicable" to the reasonableness inquiry is particularly problematic in view of the circumstances of the benefits denial decision. For example, Celanese failed to "take[] active steps to reduce potential bias and to promote accuracy . . . by walling off claims administrators from those interested in firm finances," such as would render the conflict "less important (perhaps to the vanishing point)." Glenn, 128

36

S. Ct. at 2351. Rather, Plan Administrator Smith and Benefits Committee member Cunningham made their benefits denial decision — a sudden reversal of a Plan interpretation widely shared by Celanese officials, including Cunningham — during a conference call arranged and participated in by PBI-InterTech deal negotiator Townsend. Because these and other "circumstances suggest a higher likelihood that [Celanese's conflict] affected the benefits decision," id., the conflict should have been given significant weight in the abuse-of-discretion analysis — weight that, at a minimum, probably would have tipped the scale in Appellants' favor. It is thus imperative that we at least remand this case for proper consideration of the conflict factor.

Accordingly, I dissent.